UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STEPHEN DANIEL LEONARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-cv-2047 (RC) |
| | ) | |
| | ) | |
| GEORGE WASHINGTON | ) | |
| UNIVERSITY HOSPITAL *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, appearing *pro se*, has filed a civil rights complaint under 42 U.S.C. § 1983 against George Washington University Hospital ("Hospital" or "GWUH"), Georgetown University Hospital, Georgetown University ("GTU"), the District of Columbia Metropolitan Police Department ("MPD"),[1] the District of Columbia, the District of Columbia Animal Shelter, the United States Capitol Police, and the Federal Bureau of Investigation ("FBI"). *See* Compl. Caption, ECF No. 1. Certain defendants have moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, which plaintiff has opposed.[2] For the reasons

---

[1] It is established that "MPD is a subordinate entity of the District of Columbia that is incapable of being sued in its own name." *Davis v. Sarles*, 134 F. Supp. 3d 223, 228 (D.D.C. 2015) (citing cases). Therefore, the complaint against MPD is dismissed.

[2] Currently before the Court are the separately filed motions to dismiss brought on behalf of Georgetown University, ECF No. 23; District Hospital Partners, L.P. d/b/a The George Washington University Hospital, ECF No. 28; Federal Defendants U.S. Capitol Police and the FBI, ECF No. 38; and the Humane Rescue Alliance, ECF No. 39, which operates the D.C. Animal Shelter pursuant to a contract, Mem. at 1, ECF No. 39-1. Also pending are plaintiff's motions to appoint a process server, to appoint "civil trial counsel" and "to convene a grand jury," ECF No. 29, and for a default judgment against the District of Columbia, ECF No. 49.

explained below, the Court agrees that no federal claims have been stated, and it declines pursuant to 28 U.S.C. § 1367(c) to exercise supplemental jurisdiction over any non-federal claims.[3] Therefore, the Court will grant each defendant's motion and will dismiss the case in its entirety under 28 U.S.C. § 1915(e), which requires dismissal of "the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted." *Id*. § 1915(e)(2)(B)(ii). As a result, the Court will deny plaintiff's pending motions as moot.

## II. BACKGROUND

The instant complaint presents a series of bizarre events "that began with [plaintiff's] walking into George Washington University Hospital with chest pains and culminated with him seeking political asylum in Canada and then Cuba." GTU's Mem. at 1, ECF No. 23.[4] Along the way, plaintiff's dog ended up at an animal shelter and was euthanized. *Id*. at 6.

Plaintiff alleges that the following events occurred between April 30, 2015, and May 3, 2015. Compl. at 3. After arriving at GWUH's emergency room "on or about April 30th, 2015 . . . with severe chest pains and abdominal pains" and being admitted, "agents of the D.C. Metro Police Department and FBI illegally without asking or knowledge of the [plaintiff] went and searched [his] truck parked along side [sic] the Hospital." *Id*.. Plaintiff overheard the police and hospital staff "discussing [his] dog 'having food but no water'" and "demanded to know what was going on, and why Police and Hospital Staff were in [his] vehicle and not treating [him] for medical emergencies." *Id*. The police "quickly" left the Hospital and plaintiff "filed a[n] Oral & Written Request for the video feed inside the E.R. and Outside the E.R. showing [his] vehicle." *Id*.

---

[3] A district court may decline to exercise supplemental jurisdiction over other related claims "if [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

[4] The Court will cite the page numbers assigned by the electronic case filing system.

2

at 3-4. Plaintiff addressed his request to "Hospital Security and Administrators inside the E.R. and also [to] George Washington University Police via the Emergency Beacon located 20-30 feet away from [his pickup] truck." Compl. at 4.

After the staff at GWUH "threatened to throw [plaintiff] out of the E.R.," he left and "drove to D.C. Metro Police Headquarters to make a formal Internal Affairs Complaint." *Id*. Plaintiff was told that the "2nd district" would handle "any I.A. investigation" and was given a telephone number to call. While "attempting to reach a supervisor," plaintiff "had an emergency inside his [pickup] truck while driving from the D.C.P.D. Headquarters, involving chest pains and abdominal pains." *Id*. Plaintiff drove to a police cruiser parked nearby and asked the officer to call an ambulance. The officer, whom plaintiff later learned was a U.S. Capitol Police Officer, called an ambulance and "took possession" of plaintiff's truck and his dog inside the truck. Plaintiff was taken to MedStar Georgetown University Hospital ("MedStar") and his dog was taken to the D.C. Animal Shelter. *Id*.; *see* GTU's Mem. at 4 n.2 ("[T]he hospital colloquially referred to as 'Georgetown University Hospital' is owned and operated by MedStar Heath, Inc., not by Georgetown University," and it "is a separate legal entity from the University itself.")

At MedStar, plaintiff "was left [without any treatment] on a gurney in the E.R. for close to 45 minutes," despite his loud pleas for help. Compl. at 4. Plaintiff "unbuckled [himself] from the gurney and ran outside stumbling to the residential houses off campus outside the E.R., knocking on doors to try to get someone to allow [him] to use the phone." *Id*. at 4-5. Plaintiff "was being pursued by the D.C. Fire Rescue and D.C. Police Department until a man finally allowed [him] to use his phone." Compl. at 5. Plaintiff called his "Aunt Loretta Leonard . . . and explained to her what had occurred[.] [A]t that moment [MPD officer] Tang or Tong arrived and [plaintiff] handed him the phone to speak to [his] Aunt about why the Police were chasing [him]

3

with Rescue and why the two Hospitals were not helping [him]." *Id*. The officer "verified someone was on the line and abruptly hung up the phone." *Id*. Plaintiff "then began walking down the street and away from the officer when [he] was surrounded by multiple units of the [MPD] who ordered [him] on the ground." *Id*. Plaintiff "complied and advised" about his chest pains and his unsuccessful attempt to obtain medical care. The police "kept [plaintiff] on the ground for an hour or longer until [he] was rolling around in the dirt and grass with unbearable chest pains brought on by still unknown causes." *Id*. Thereafter, Officer Tang or Tong and another officer placed plaintiff "into the back of a Police Car and drove [him] around the city making two separate stops" and "finally took [plaintiff] to some sort of Mental Health Evaluation Center . . . in D.C." where he was "admitted against [his] will without a criminal charge or any other lawful reason and left . . . there." *Id*. "[T]he nurses or doctors or staff and police officers came into the room with a needle, injected [plaintiff] with some type of liquid against [his] will and against [his] requests, took the handcuffs off and left [him] to sleep on the floor." *Id*. at 6. The next morning, plaintiff was told he could leave and was "given a paper stating [he] had anxiety[.]" *Id*.

While waiting for a bus outside of the Center, plaintiff "collapsed" and "woke up in the E.R. at George Washington University Hospital to nurses telling [him] to go into a Paded [sic] Room." *Id*. Plaintiff refused and "ran out of the hospital" only to be "caught and detained" by hospital staff and security. *Id*. Plaintiff was told that he needed "to sign a Medical Refusal Form," which he "pretended" to do before "running into the sidewalk[.]" Compl. at 6. Plaintiff then "heard them yell 'there's no ink on the paper, he didn't sign it' and someone in the bunch made the call to 'let him go.' " *Id*. Plaintiff ran five blocks and then "laid down in the grass" near the White House. He staggered a bit more but then experienced chest pains and collapsed

4

near the National Archives building.  *Id*.  A man proceeded to help plaintiff and "offered" to get plaintiff's truck parked at 3rd and Constitution Avenue; plaintiff told the man that his keys were either with the Capitol Police or "on the seat" of the truck.  Compl. at 7.  The man returned "about 30-40 minutes later" without the truck and offered plaintiff cab fare to get to the truck and $10 should he need to return to the Hospital.  *Id*.

When plaintiff arrived at his truck, he smashed a door window, took his cell phone and "set off to C.N.N. Headquarters which was a few blocks away at Union Station."  *Id*.  Plaintiff asked a security guard to allow him into the building because he "needed to speak to someone from C.N.N. about some incidents that had occurred over the past two days."  *Id*.  The security guard "refused [plaintiff] access or help."  *Id*.  Plaintiff sat on a bench outside of CNN to "wait[ ] for a journalist to come along," but his chest and stomach pains returned.  *Id*.  Plaintiff does not recall whether he or someone else called 911 but D.C. Fire Rescue arrived and plaintiff left.  *Id*.  Plaintiff tried to enter CNN's building through a side entrance but "was told via intercom by Security to 'get away from the door.' "  *Id*.

Plaintiff next walked "4 blocks away" to the "F.B.I. Field Office . . . to make [a] complaint about what was occurring."  *Id*.  He was followed by a "black car w/tinted windows[.]" Compl. at 8.  Plaintiff "ran into Georgetown University Law Library," signed the visitors log "on May 01 or May 02, 2015 and wrote help and turned it so that the Docent/Asst. could see what [he] wrote." *Id*.  Plaintiff waited "a few minutes" and then went outside where he "saw the car was gone." *Id*.  Plaintiff then "bolted out for the F.B.I. office 1 block over."  *Id*.   When he arrived, plaintiff , speaking through an outside telephone, "advised them who I was, why I was there and requested to speak to the duty offices" but was refused help.  Plaintiff "told them that [he] wasn't leaving until

5

the duty agent came out or spoke to [him] and advised them [that he] was in fear for [his] life[,]" but "[t]hey came outside and kicked [plaintiff] off their property." *Id*.

Having no success at the FBI, and "with no alternatives," plaintiff walked down the street and went inside a church "to hide." *Id*. Plaintiff "kicked open the Pastor[']s door and barricaded [himself] inside with an Industrial Printer and Furniture blocking the door." *Id*. Plaintiff called his Aunt Loretta again but she "acknowledged [plaintiff's] concerns but couldn't help [him]." Compl. at 9. Plaintiff left the church and obtained from the Capitol Police his truck keys, a case number, and the D.C. Animal Shelter's contact information. He then drove back to the church "and went inside and barricaded [himself] in the Pastor[']s office until daylight." *Id*. At daylight, plaintiff sought help from the church's administrator and "had a brief Q & A" with the Pastor, who eventually contacted the "authorities." *Id*. An MPD officer took plaintiff "outside and contacted D.C. Fire Rescue," which determined that plaintiff needed emergency care and transported him to "University Hospital off N. Capitol St.[.]" *Id*. According to plaintiff, MPD "attempted to get Hospital staff to inject [him] with some type of psychotropic and Baker Act [him]," but he refused to be injected "with anything unless it was to help with [his] chest & abdominal pains."[5] *Id*.

After "arguing with the nurses and administrators" about his treatment, plaintiff "left the hospital staggering and struggling to a bus stop," where he again collapsed. Compl. at 10. After "an hour or so," plaintiff hailed a taxi and returned to his truck parked "outside the Church next to the F.B.I. office on 3rd St. N.W.." *Id*. Plaintiff then "left D.C. to go to Johns Hopkins in Baltimore, [Maryland], but "was followed to Baltimore . . ., then to Glen Burnie, Md., and

---

[5] The Baker Act is the common name for the Florida Mental Health Act, F.S.A. § 394.467, which "governs the involuntary inpatient placement of persons with mental illness." *Doe v. State*, 217 So.3d 1020, 1024 (Fla. May 11, 2017). Plaintiff is incarcerated in Florida at the Okeechobee Correctional Institution. *See* Case Caption.

6

eventually had to Commodeer [sic] a Semitruck [sic] on May 04, 2015 while running for [his] life to get medical care and away from the people who were following [him] around since April." *Id*. "A high speed chase up I-95 ensued, went across 4 States and ended when [plaintiff] made it to the United Nations Headquarters in New York City," where he filed a "Complaint against the United States for violations of multiple treaties, laws and Constitutional Rights[.]" *Id*. Plaintiff then drove "to the Port Authority Police at Lincoln Tunnel and Requested their help and protection. That led to an incarceration at Rikers Island for 60 days [and] 4 separate hospital ER visits seeking proper medical care[.]" *Id*. After the U.N.'s Office of Human Rights "acknowledged" plaintiff's complaint in July 2015, he "ran for Political Assylum [sic] in Canada, was thereafter deported, and then to an effort to seek Assylum [sic] in Havana, Cuba." *Id*.

In August 2016, plaintiff filed the instant "Complaint Under the Civil Rights Act, 42 U.S.C. § 1983" in the United States District Court for the Southern District of Florida, ECF No. 1, which transferred the case to this Court on October 12, 2016. *See* Order, ECF No. 11. The complaint consists of five uncaptioned counts. *See* Compl. at 11-14. In the Relief section of the complaint, plaintiff seeks monetary damages. *Id*. at 15. In addition, plaintiff "want[s] to know who's responsible behind this cloak of shadows and secret lies that's destroyed my life. . . who killed [his] dog and why[,] . . . [and] who took [his] truck from the Police yard in Maryland," as well as "accountability under Criminal Statutes and Civil laws." *Id*.

### III. LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint."

7

*Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The motion does not test a plaintiff's ultimate likelihood of success on the merits, but only forces the court to determine whether a plaintiff has properly stated a claim. *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 467 (D.C. Cir. 1991). "[W]hen ruling on a defendant's motion to dismiss [under Rule 12(b)(6)], a judge must accept as true all of the factual allegations contained in the complaint[,]" *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (citations omitted), and construe them liberally in the plaintiff's favor. *See, e.g., United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

It is not necessary for the plaintiff to plead all elements of a prima facie case in the complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28-29 (D.D.C. 2010). Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555. When performing the "context-specific task" of deciding whether a plausible claim has been stated, a court must "draw on its judicial experience and common sense[.]" *Iqbal*, 556 U.S. at 679.

A *pro se* complaint, such as here "must be held to less stringent standards than formal pleadings drafted by lawyers . . . . But even a *pro se* complainant must plead "factual matter" that permits the court to infer "more than the mere possibility of misconduct." *Atherton*, 567 F.3d at 681-82 (citations omitted).

## IV. DISCUSSION

Section 1983 provides a cause of action against

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

42 U.S.C. § 1983. A plaintiff bringing a § 1983 claim "must allege both (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the defendant acted 'under color of' the law of a state, territory or the District of Columbia."[6] *Hoai v. Vo*, 935 F.2d 308, 312 (D.C. Cir. 1991). Section 1983 claims are properly brought against government actors in their personal capacity. *See Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997). Thus, to maintain a § 1983 suit, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "Government officials may not be held liable for the unconstitutional conduct of

---

[6] Section 1983 does not typically apply to individuals employed by federal entities such as the FBI and the Capitol Police, and plaintiff has alleged no *facts* to support his conclusory assertions that the federal defendants were working in "collusion" or "agreement," Compl. at 11, 12, with MPD and/or private parties performing local government functions. Therefore, the Court finds no § 1983 claim stated against the federal defendants. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005) (Although "[s]ection 1983 does not apply to federal officials acting under color of federal law[,] . . . a cause of action under § 1983 will lie against [federal officials] when acting pursuant to . . . District of Columbia law[.]"); *Williams v. United States*, 396 F.3d 412, 414 (D.C. Cir. 2005) ("In cases under section 1983, circuit courts looking at whether defendants have acted 'under color of' state law have . . . focused on whether the[ ] defendants are state officials or have conspired with state officials in committing the alleged illegal acts.").

their subordinates under a theory of respondeat superior," and "vicarious liability is inapplicable." *Iqbal*, 556 U.S. at 676.

Plaintiff has not named any individual defendants, but this omission is not fatal at this pre-discovery phase of the proceedings. *See Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) ("Plaintiff may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery."). Furthermore, as a municipal corporation, the District is a "person" within the meaning of the statute and is therefore subject to liability under § 1983 "when an official policy or custom causes [a] complainant to suffer a deprivation of [a] constitutional" or federal right. *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986); *accord Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004); *see also Moreno v. District of Columbia*, 925 F. Supp. 2d 93, 99 (D.D.C. 2013) ("In order for the District to be held liable for the acts of a wrongdoer under its authority, a plaintiff must show that the District was the 'moving force' behind the alleged constitutional deprivation.") (quoting, *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). And at least one of the private defendants has acknowledged that in certain circumstances courts in this circuit have applied municipal liability "to claims against private entities such as Georgetown University." GTU's Mem. at 10, n.4; *see Jordan v. District of Columbia*, 949 F. Supp. 2d 83, 90 (D.D.C. 2013) (" '[A] challenged activity may be state action . . . when a private actor operates as a willful participant in joint activity with the State or its agents.' ") (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (alteration in original)); *see also Oladokun v. Corr. Treatment Facility*, 5 F. Supp. 3d 7, 17 n.11 (D.D.C. 2013) ("[M]any courts have adopted the custom or policy requirement when

10

adjudicating § 1983 claims against private entities.") (citations omitted)). To succeed on a municipal liability claim, however, "a plaintiff must show a course deliberately pursued by the city, 'as opposed to an action taken unilaterally by a nonpolicymaking municipal employee,' . . ., and 'an affirmative link between the [city's] policy and the particular constitutional violation alleged.' " *Carter*, 795 F.2d at 122.

The fatal flaw with the Complaint is that even with the presumption of truth, plaintiff's factual allegations simply fail to support a violation of the Constitution or federal law or a basis for municipal liability. The Court will first address the federal laws plaintiff has invoked and then his alleged constitutional violations.

**1. Federal Laws**

Plaintiff cites in the counts of the Complaint 42 U.S.C. §§ 1981, 1985 and 1986. *See* Compl. at 11, 12. Section 1981 "proscribes discrimination based solely on race." *Cromeartie v. RCM of Washington, Inc.*, 118 F. Supp. 3d 335, 338 (D.D.C. 2015) (citing *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (other citation omitted). Section 1985(3), which is the only paragraph possibly applicable here, creates an action against "two or more persons in any State or Territory" who "conspire" to deprive "any person" of the equal protection of the laws, or of equal privileges and immunities under the laws[.]" *Id*. The Court of Appeals has explained:

> Section 1985(3) provides a cause of action against two or more persons who participate in a conspiracy motivated by class-based discriminatory animus. . . . To state a claim under § 1985(3), [a plaintiff must] allege: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, . . . and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in her person or property or deprived of any right or privilege of a citizen of the United States. The statute does not apply to all conspiratorial tortious interferences with the rights of others, but only those motivated by some class-based, invidiously discriminatory animus.

11

*Atherton*, 567 F.3d at 688 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 96-102 (1971); *Martin v. Malhoyt*, 830 F.2d 237, 258 (D.C. Cir. 1987) (other citation and internal quotation marks omitted)). Plaintiff has not alleged (1) that he is a member of a recognized protected class, *e.g.*, a racial minority group, and (2) that defendants' actions were motivated by "some class-based, invidiously discriminatory animus." *Martin*, 830 F.2d at 258. Therefore, plaintiff has stated no claim under § 1981 or § 1985(3). Nor has plaintiff stated a claim under § 1986 "[s]ince § 1986 imposes liability upon a person who "neglects or refuses" to prevent a wrong under § 1985." *Jackson v. Donovan*, 856 F. Supp. 2d 147, 150 (D.D.C. 2012); *see Philogene v. District of Columbia*, 864 F. Supp. 2d 127, 132 (D.D.C. 2012) ("Because a colorable claim under § 1985 is a prerequisite to a claim under § 1986, the plaintiff's § 1986 claim must also be dismissed.") (citation omitted)).

In addition to the civil rights statutes, plaintiff cites federal criminal statutes. *See* Compl. at 11-12, 14 (citing 18 U.S.C. §§ 241, 242, 1113, 1503, 1510-13, 1964). But "[t]he Supreme Court has 'rarely implied a private right of action under a criminal statute,' " and "a 'bare criminal statute,' with no other statutory basis for inferring that a civil cause of action exists, is insufficient to imply Congress intended to create a concomitant civil remedy." *Lee v. United States Agency for Int'l Dev.*, 859 F.3d 74, 77 (D.C. Cir. 2017) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979); *Cort v. Ash*, 422 U.S. 66, 79-80 (1975)). It is established that Sections 241 and 242 of Title 18 of the U.S. Code provide "no private right of action[.]" *Crosby v. Catret*, 308 Fed. App'x 453 (D.C. Cir. 2009) (per curiam). In addition, § 1113 (Attempt to commit murder or manslaughter); § 1503 (Influencing or injuring officer or juror generally); § 1510 (Obstruction of criminal investigations); § 1511 (Obstruction of State or local law enforcement); § 1512 (Tampering with a witness, victim, or an informant); and § 1513 (Retaliating against a witness,

12

victim, or informant) are the type of "bare criminal statute[s]" from which no private right of action is implied.

Section 1964 provides a "private right of action for treble damages to any person injured in his business or property by reason of [ ] conduct" proscribed under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). "RICO makes it 'unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt[.]' " *Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 153 (D.D.C. 2016) (quoting 18 U.S.C. § 1962(c)). A plaintiff asserting a claim under RICO must allege the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Zernik v. U.S. Dep't of Justice*, 630 F. Supp. 2d 24, 27 (D.D.C. 2009) (quoting *Pyramid Secs. Ltd. v. IB Resolution, Inc*., 924 F.2d 1114, 1117 (D.C. Cir. 1991)). The RICO statute defines "pattern of racketeering activity" as requiring the commission of at least two predicate racketeering offenses within a ten-year period. *See* 18 U.S.C. § 1961(5). "Predicate offenses satisfying the statute include acts punishable under certain state and federal criminal laws, such as mail and wire fraud." *Busby v. Capital One, N.A.*, 772 F. Supp. 2d 268, 281 (D.D.C. 2011) (citing 18 U.S.C. § 1961(1)(B)). The predicate acts must be related and must "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The alleged chance encounters supporting plaintiff's § 1983 claim "do not constitute racketeering activities and cannot form the basis of a RICO claim." *Cheeks*, 216 F. Supp. 3d at 156 (citing *Taitz v. Obama*, 707 F. Supp. 2d 1, 6 (D.D.C. 2010)).

## 2. Constitutional Violations

Also throughout the counts of the Complaint, plaintiff claims that at various times during his ordeal, the defendants violated his rights under the Fourth, Eighth and Fourteenth Amendments. At the outset, the Court finds no claim stated under the Eighth Amendment because this action does not stem from a conviction. The Eighth Amendment prohibits the government from imposing "excessive fines" and inflicting "cruel and unusual punishments." U.S. Const. amend. VIII. It "has no application" until "there ha[s] been [a] formal adjudication of guilt[.]" *City of Revere v. Massachusetts General Hosp*. 463 U.S. 239, 244 (1983); *see Oladokun*, 5 F. Supp. 3d at 15 n.8 ("Because plaintiff was a pretrial detainee, his custody was not punishment and, as such, the Eighth Amendment did not apply.") (citing cases). In addition, the Fourteenth Amendment does not apply to the District of Columbia because it is "a political entity created by the federal government." *Doe v. D.C.*, 206 F. Supp. 3d 583, 604 n.11 (D.D.C. 2016) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Propert v. District of Columbia*, 948 F.2d 1327, 1330, n.5 (D.C. Cir. 1991)). But the District of Columbia is subject to the Fifth Amendment's due process clause, *see Oladokun*, 5 F. Supp. 3d at 15 n.8, and the " 'due process protections under the Fifth and Fourteenth Amendments are the same,' " *Doe*, 206 F. Supp. 3d at 604 n.11 (quoting *English v. District of Columbia*, 717 F.3d 968, 972 (D.C. Cir. 2013)). Therefore, the Court liberally construes plaintiff's Fourteenth Amendment claim as brought under the Fifth Amendment's due process clause.

*A. Fourth Amendment*

The Fourth Amendment prohibits the government from conducting "unreasonable searches and seizures[.]" U.S. Const. amend. IV. In addition, a warrant is generally required before a search ensues. But "courts from the United States Supreme Court on down have long

recognized the important role that police play in safeguarding individuals from dangers posed to themselves and others—a role that will, in appropriate circumstances, permit searches and seizures made without the judicial sanction of a warrant." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 551 (7th Cir. 2014) (citations omitted). The "community caretaking doctrine recognizes that police sometimes take actions not for any criminal law enforcement purpose but rather to protect members of the public[.]" *Id*. at 553-55 (examining *Cady v. Dombrowski*, 413 U.S. 433 (1973), upholding warrantless search of an automobile for purposes removed from a criminal investigation).

In Count 1 of the Complaint, plaintiff claims that GWUH, George Washington University, MPD, and the FBI "illegally search[ed] his vehicle" and "deprived [him] of medical care" after he complained about the search. Compl. at 11. By plaintiff's own account, however, his truck "was parked along side [sic] the Hospital," and he left the emergency room voluntarily when he "overheard" hospital staff and police officers "discussing" his dog "having food but no water[.]" Compl. at 3. Those facts do not establish a search of any kind, let alone one implicating the Fourth Amendment.[7] To the extent that plaintiff's Fourth Amendment claim is based on the actual possession of his truck and dog, the Court finds no constitutional implications. Plaintiff alleges that he experienced a medical emergency while driving his truck on a public street, requested that an officer nearby call an ambulance, and was transported by ambulance to MedStar's emergency room. Compl. at 4. It was then that the Capitol Police officer took

---

[7] In his opposition to both Georgetown University's and George Washington University Hospital's motions, plaintiff speculates that the hospital staff colluded with law enforcement officials to delay his treatment while his truck was being searched, positing that it was "obvious that the Defendants were involved in discussions with the law-enforcement officials, and may have believed that the law-enforcement officials were going to detain or arrest the Plaintiff[.]" Pl.'s Opp'n at 2-3, ECF No. 36. Plaintiff admits, however, that he "never" saw "who searched his truck because [he] was laying down in agony [in the emergency room] begging for help, treatment and care." *Id*. at 4. And plaintiff freely left the hospital.

15

possession of plaintiff's truck left behind and sent his dog found inside the truck to the D.C. Animal Shelter. *Id*. Such conduct falls squarely within the community caretaking function discussed above.

### B. Fifth Amendment

The Fifth Amendment prohibits the government from depriving an individual of life, liberty or property without due process of law. Constitutional due process requires notice and a meaningful opportunity to be heard. *See Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id*. (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

The only conduct raising potential due process concerns appears in Count 2, where plaintiff alleges that he was placed "in a Psych ward to be illegally injected with some type of Psychotropic without a lawful or Justifiable Cause," Compl. at 11, and in Count 5, where plaintiff alleges that the Animal Shelter euthanized and then cremated his dog, *id.* at 13.[8]

By his own account, plaintiff exhibited erratic behavior before being taken in handcuffs to "some sort of Mental Health Evaluation Center[.]" Compl. at 5. Among other things, plaintiff voluntarily left MedStar's emergency room after being there for 45 minutes and complaining in a

---

[8] In Count 3, plaintiff alleges "[o]n or about May 2nd, 2015," the FBI, Georgetown University Law School, MPD and the District of Columbia "fail[ed] to protect" him "from harm after [he] requested help and assistance" and their "neglects to take a report or record the incident in official records . . . forced [him] to act in self-defense to escape the threat of harm or imminent harm by barricading himself in a church overnight." Compl. at 12. Plaintiff has not identified the constitutional provision upon which this count rests. But absent a special relationship, such as a custodial one not pled here, "a state ordinarily has no constitutional duty to protect private citizens from doing harm to each other, so the state's failure to protect an individual from private injury does not violate that individual's due process rights." *Waubanascum v. Shawano Cty.*, 416 F.3d 658, 665 (7th Cir. 2005) (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). Mere negligence does not rise to the level of a constitutional violation. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("We conclude that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."). Therefore, the Court will not address the merits of any potential negligence claim. Nor will the Court address whether plaintiff's general allegations of "collusion" or "agreement" to harass and torment him, Compl. at 11, 12, state a claim of civil conspiracy under District of Columbia law.

raised voice about the lack of treatment. He then proceeded to "stumbl[e]" to nearby houses and knock on doors seeking to use a phone, all while being pursued by "D.C. Fire Rescue" and MPD. Compl. at 4-5. Allegedly, at the mental health facility, plaintiff was injected "with some type of liquid against [his] will." *Id*. at 6. Thereafter, the handcuffs were removed and plaintiff was "left [overnight] to sleep on the floor." *Id*. He was permitted to leave the next morning, having been diagnosed with anxiety. *See id*. The fact, taken here as true, that plaintiff was "admitted . . . without a criminal charge or any other lawful reason," Compl. at 5, undermines the notion that he was in the custody of the District of Columbia. In addition, plaintiff has not alleged that the individuals who held him for a mental health evaluation and injected him against his will did so pursuant to a municipal policy or custom, let alone one that is unconstitutional.[9]

With regard to his dog Jasmine, plaintiff admits that the day after his truck and Jasmine were taken, he contacted the Capitol Police and was given the keys to his truck, a case number, and contact information for the D. C. Animal Shelter. *See* Compl. at 9. Plaintiff did not contact the Shelter, however, until nearly two months later -- after "going on the run to multiple hospital E.R.'s in 4 separate states; *i.e*., D.C., Va., Md & N.Y." and being released from Rikers Island in July 2015. *Id*. at 15. Plaintiff then learned "that Jasmine was 'Put to Sleep' on June 10, 2015," her remains were " 'cremated and her ashes were buried on an Apple Farm in Virginia.' " *Id*.

---

[9] Plaintiff generally alleges that MPD officers participated in certain actions. He specifically identifies an officer "Tang or Tong" as one who pursued him and took him to the mental health facility, but he has not named that officer as a defendant. More importantly, plaintiff has not alleged that the MPD officers violated his constitutional rights while acting pursuant to an unconstitutional government policy or custom, and municipal liability cannot rest "on a simple theory of *respondeat superior*." *Philogene v. District of Columbia*, 864 F. Supp. 2d 127, 131 (D.D.C. 2012) (citation omitted). In *Philogene*, the plaintiff had alleged that an officer had "violated a number of his constitutional rights by citing and arresting him." *Id*. This Court concluded: "Even if his allegations were sufficient to establish a predicate constitutional violation, the plaintiff's claim founders on the second step of the inquiry" by failing to "articulate any specific allegations describing a government policy or custom behind [the officer's] actions." *Id*. That same reasoning applies to the instant claims against the District of Columbia. Although the District of Columbia has not appeared in this case, the Court has no choice under the screening provisions of 28 U.S.C § 1915(e) but to dismiss the complaint against the District without prejudice.

Plaintiff accuses the Shelter of "arbitrarily kill[ing] [his] Dog" with "malice [and] hatred," and "feels that a charge of Attempted Murder; Premeditated, will result in a proper investigation Pursuant to 18 § 1113 USC." *Id*. at 14. But, as discussed above, the criminal statute provides no private right of action, and it is long-established that "in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D*., 410 U.S. 614, 619 (1973).

Given plaintiff's self-described odyssey, he has failed to plausibly allege that the Animal Shelter could have located him to provide him with notice and an opportunity to be heard prior to disposing of his dog. More importantly, plaintiff has not alleged that employees at the Animal Shelter acted pursuant to an unconstitutional policy or custom, and he has not refuted the Shelter's argument to the contrary. *See* Human Rescue Alliance's Mem. at 3-4 (asserting compliance with D.C. laws governing disposal of animals); Mar. 1, 2017 Order (informing plaintiff that the defendant's unopposed arguments may be treated as conceded).

## V. CONCLUSION

For the foregoing reasons, the Court concludes that plaintiff has stated no federal claims and declines to exercise supplemental jurisdiction over any D.C. or common law claims. Therefore, defendants' motions to dismiss will be granted, and plaintiff's motions will be denied. A separate Order accompanies this Memorandum Opinion.

_____/s/_____
RUDOLPH CONTRERAS
United States District Judge

Date: August 7, 2017